Filed 12/17/14  In re W.L. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

|  |  |
|---|---|
| In re W.L., a Person Coming Under the Juvenile Court Law. | D066042 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. DALE L., Defendant and Appellant. | (Super. Ct. No. EJ3305D) |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Dale L. appeals findings and an order entered at a permanency plan and selection hearing for his son, W.L., under Welfare and Institutions Code section 366.26.[1] He contends the court erred when it found that W.L. did not have a beneficial parent/child relationship with his father and terminated parental rights. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

W.L. was born in December 2008 while his mother was incarcerated. When W.L. was approximately 10 days old, his father, Dale, took custody of him and raised him as a single parent. W.L.'s mother did not remain in his life.

On May 3, 2012, the San Diego County Health and Human Services Agency (Agency) filed a petition alleging there was a substantial risk three-year-old W.L. would suffer serious physical harm or illness as a result of domestic violence and inadequate supervision. Dale was arrested for domestic violence on March 12. He left W.L. in the care of his girlfriend, who was a known drug user, and W.L. tested positive for methamphetamine. In January 2011, another girlfriend was caring for W.L. when she was arrested on charges of possession of heroin. W.L. was present during a domestic altercation between his father and this girlfriend in June 2011.

---

[1] All further statutory references are to the Welfare and Institutions Code.

Dale submitted to a drug test in May 2012, which was negative. He was convicted of domestic violence and ordered to complete a 52-week program. Dale acknowledged he had a history of drug and alcohol abuse. He had felony convictions for conspiracy, burglary and receiving stolen property in 2002. He also had two misdemeanor convictions: in 1998, for being under the influence of a controlled substance and in 2001, for theft.

Dale told a social worker he accepted responsibility for leaving W.L. with inappropriate caregivers and was taking steps to disassociate himself from unsuitable persons. Dale said he had lived a hard life because of drugs. He and his son had a good life that was focused on outdoor activities and nature. Dale restored cars and boats. He liked teaching W.L. about mechanics and how things worked.

The social worker said Dale was attentive to W.L.'s needs. W.L. was a well-behaved, well-mannered child who said "please" and "thank you." W.L. and Dale appeared to have an appropriate, strong attachment to each other. W.L. was happy during the visit until it was time for Dale to leave. W.L. wanted to take his nap at home and insisted on leaving with his father.

The social worker said Dale was hard working and did his best to raise his son without any support from the child's mother. However, he had had a succession of violent relationships with women who had substance abuse problems. W.L. described witnessing a domestic violence incident and said he was scared and tried to hide.

According to the social worker, Dale's care of W.L. was evident in the child's behavior and manners. Dale met W.L.'s needs for appropriate food, shelter and clothing,

3

and was in the process of securing health insurance and making an appointment for W.L.'s delayed hernia operation when the child was detained. W.L. had a delightful personality. He was respectful to adults, and presented as a genuinely happy and healthy child.

In July 2012, the juvenile court sustained the section 300 petition, placed W.L. with nonrelative extended family members (caregivers), and ordered a plan of reunification services for Dale.

After several initial supervised visits, Dale was allowed unsupervised visits with his son. Visitation was interrupted when Dale was hospitalized. The Agency was willing to expand visitation to allow home visits; however Dale would not disclose the identity of the woman with whom he was living to the Agency.

Dale complained he was not gaining any benefit from services and had to be encouraged to continue to participate in them. Between May 9 and August 30, Dale submitted to random substance abuse testing 16 times. Three of those tests were positive for alcohol and low levels of methamphetamine. Three other specimens were diluted and considered unsuitable for testing. Dale tested positive for amphetamine, methamphetamine, codeine, morphine and THC (tetrahydrocannabinol) on August 30. On September 1, Dale was arrested for assaulting his girlfriend, false imprisonment and violating a restraining order, and was incarcerated. He punched and kicked his girlfriend, sending her to the hospital with a concussion and a broken nose. When asked about domestic violence, he said he could not help the way "these women act."

The Agency learned that Dale's girlfriend was the daughter and stepdaughter of W.L.'s caregivers, and he had not disclosed their ongoing relationship to the social worker or the caregivers. The caregiver said her relationship with her stepdaughter was strained because of the daughter's drug use, and they "love[d] her from a distance."

W.L. called his caregivers "Nana" and "Papa." After Dale was incarcerated, W.L. wanted to know where his father was and why he could not live with him. The social worker referred W.L. to therapy to address the ongoing questions he had about his father's circumstances. The social worker said W.L. was a sweet-natured child who was generally happy and lighthearted. According to the court-appointed special advocate (CASA), W.L. was a caring, thoughtful child, who was much more aware and considerate of others than most children. W.L.'s teacher said W.L. was on track developmentally and had an above average awareness of other people's needs.

Dale was released from jail in December. He visited W.L. on December 10, bringing a birthday cake he had made for W.L. W.L. was happy to see his father. Visits went well and there were no concerns about their interactions.

On January 22, 2013, Dale disclosed he had used methamphetamine. He entered an inpatient substance abuse treatment facility. He was discharged in March for noncompliance. Dale became upset, telling his therapist not to be surprised if the news showed that some people had been shot and he had committed suicide. The therapist notified the social worker about Dale's threats, and W.L. and his caregivers moved to a motel for several days. Dale apologized to the social worker. He said he was just venting and did not intend his remarks to be taken seriously. The social worker made

5

arrangements for Dale to enter another substance abuse treatment facility. By July, Dale had reached phase III of the program, started therapy and obtained employment. However, in August, Dale was discharged from the substance abuse treatment program for taking a medication that was not approved for his use.

At the time of the 12-month review hearing in August 2013, Dale had just started therapy. He had not been able to regularly participate in domestic violence treatment and was seeing a former girlfriend with whom he had a history of domestic violence. The juvenile court terminated reunification services and set a hearing under section 366.26.

The social worker assessed W.L. as adoptable. He was a happy, cheerful little boy without any behavior problems. His teacher said W.L. was "very well adjusted." The social worker asked W.L. to draw the people he wanted to be in his house as he grew up. He named only Nana and Papa. The social worker continued to speak to W.L. about placement. At times, W.L. said he wanted to live with his father. At other times, he expressed a desire to remain with his caregivers.

W.L.'s caregivers decided they did not have the ability to provide a permanent home to W.L. because of their ages and health. In February 2014, the Agency transitioned W.L. into a new foster home, which was a concurrent adoptive home. W.L. said he was happy with his new family. He did not display any anxiety or acting out. The foster family was committed to maintaining contact between W.L. and his former caregivers, and the four adults had developed a good relationship. The foster family understood that W.L. would benefit from continued contact with his father. However,

6

due to Dale's history of domestic violence and threats, they were not open to allowing W.L. to have any contact with Dale unless supervised by the Agency.

W.L. continued to visit his father every week. According to the social worker, the visits were comfortable and cordial. W.L. greeted his father with a smile and hug, and hugged him good-bye. Dale often brought a toy or food to share with him.

The section 366.26 hearing was held on May 14 and 15, 2014. The court received reports from the social worker and the CASA, and accepted W.L.'s stipulated testimony. Dale and his friend, Nancy S., testified.

The social worker observed two visits between Dale and W.L. in November 2013. W.L. gave his father a present of a necklace and bracelet he had made out of beads. Dale spoke softly and lovingly with W.L. Dale asked W.L. about school, his friends, the caregivers' family and dogs, and if he was brushing his teeth. They played Monopoly together. Toward the end of the visit, Dale gently encouraged W.L. to clean up, and they worked together. At the next visit, Dale brought games and books, and wore the bead necklace W.L. had made for him. W.L. put his hand on his father's hand as they sat near each other. At the end of the visits, Dale put W.L. in his car seat. They exchanged hugs and kisses, and said "I love you" to each other.

The social worker said W.L.'s visits with his father were positive and he obviously loved his father. He enjoyed Dale's attention and company. However, the social worker said Dale had become merely a friendly visitor to W.L. because his visitation had been interrupted by Dale's health problems, incarceration and substance abuse treatment. In the social worker's opinion, W.L. would benefit more from having a permanent home

7

than he would from continued contact with his father. She acknowledged that W.L. would experience a loss if his relationship with his father was severed, but any harm to W.L. would be ameliorated by having a stable and permanent home.

Nancy S. testified she saw Dale and W.L. several times a week before W.L.'s removal. W.L. played with her granddaughter. He was a daddy's boy. W.L. had a little toolbox and would pretend to help his father. If he were hurt, he would cry for his father. If W.L. misbehaved, Dale would make him take a nap or stop watching television. Dale was strict. If he said it, he meant it. W.L. knew that and obeyed his father. Nancy last saw Dale and W.L. before W.L. was placed in protective custody.

Dale testified he moved to a new neighborhood on the advice of the first social worker. He did not remain in contact with his former associates. Dale was a carpenter/laborer. He was temporarily laid off but expected to start work again within the month. Dale had good recommendations from his employers. Dale said he was sober and was attending Narcotics Anonymous meetings. Although he was court ordered to complete a domestic violence treatment program as a condition of probation, he attended sessions sporadically. When W.L. lived with his caregivers, Dale would pick him up for visits. They would go to the feed store to look at the baby chickens, or to the park to play ball or fly a remote controlled helicopter. Currently, Dale telephoned W.L. two or three times a week and visited him once a week.

According to supervised visitation logs, W.L. consistently went to his father easily and willingly, and interacted and communicated with him. He initiated and displayed physical affection with his father, and remained in close physical proximity to him. Dale

8

was very active with W.L. while remaining aware of his safety. At a visit in December 2013, W.L. ran to the door as soon as his saw his father arrive. They held hands as they walked to the visitation room. Dale helped W.L. put things together and encouraged him to clean up before playing with another toy. At a January visit, W.L. ran towards Dale when he saw him and gave him a hug. W.L. enjoyed being with his father throughout the visit. At another visit, Dale appeared to be tired but remained engaged with W.L. throughout the visit. On another occasion, Dale and W.L. walked to the parking lot hand in hand. In February, W.L. hugged his father tightly around his neck. Dale said, "I love you son. You're the best son there is." W.L. replied, "I know." They "high-fived" each other.

At the first visit after W.L. was placed with the new foster family, W.L. ran to Dale and gave him a Valentine's Day card he had made for him at school. Dale thanked him and said, "I love it, son, and I love you." W.L. replied, "Yeah, I already knowed that." They enjoyed playing outside and looking for bugs. Dale gave an interactive globe to W.L. and showed him how to use it.

The parties stipulated to the admission of W.L.'s interview with father's attorney and minor's counsel. W.L. said he liked living with his new family because they had lots of toys and a playground, and they were nice to him. He liked having a sister. W.L. said he visited his dad once or twice a week. He liked visiting his dad because he liked to play with him. He wanted to see his dad every day. If W.L. could live anywhere he wanted, he would live with his dad. He knew the word "adoption" meant he would "stay here and become a [new family's last name]." He felt good about that because the family

9

was nice to him. W.L. did not know that adoption meant he might not be able to see his dad again. W.L. said he would be "sad" if he could not see his dad. When asked why, he said he did not know. Minor's counsel asked him if he knew he would be sad. W.L. replied he did not know if he would be sad.

The juvenile court said it was impressed with Dale and had a lot of respect for him, especially his work ethic. Dale had a deep and abiding love for his son. W.L. had great affection for his father and visitation was positive for him. The court found that Dale proved he had a positive relationship with his son and was much more than a friendly visitor. W.L. recognized his father as "daddy." However, he was happy being in a stable home. Characterizing it as a "tough" decision, the court found there were no exceptions to adoption and terminated parental rights.

DISCUSSION

A

*The Parties' Contentions*

Dale contends the juvenile court erred when it terminated his parental rights because the evidence established he and W.L. shared a beneficial parent/child relationship. He states the evidence shows that he maintained regular contact and visitation with his son and that he and W.L. shared an extraordinarily close connection. He consistently demonstrated a parental role with W.L. W.L. was disappointed if his father was not able to visit him. Dale argues W.L. had a close bonded relationship with him, and would suffer great harm if the relationship was severed, and the importance of the parent/child bond to W.L. outweighed the benefits he would gain from adoption.

10

The Agency contends Dale did not occupy a parental role in W.L.'s life. The social worker assessed Dale's relationship to W.L. to be that of a friendly visitor, and the beneficial relationship exception did not apply. The Agency further argues that even if Dale had a parental relationship with W.L., Dale failed to prove that the benefit of continuing the parent/child relationship outweighed the benefits of adoption to W.L., who needed permanence and stability.

B

*Legal Principles and Standard of Review*

At a section 366.26 hearing, the court may select one of three permanency plans: adoption, guardianship or long-term foster care. (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7.) There is a strong preference for adoption over alternative permanency plans. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588-589.) If the court determines the child is likely to be adopted, the burden shifts to the parent to show by a preponderance of evidence that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " '[B]enefit from continuing the . . . relationship' " means " 'the [parent/child] relationship' . . . promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a

11

permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

Where the parent has continued to regularly visit and contact the child, and the child has maintained or developed a significant, positive, emotional attachment to the parent, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging that a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

We adopt a hybrid standard of review to determine whether the court erred in deciding whether the beneficial parent/child relationship exception to termination of parental rights applies.  (See *In re J.C.* (2014) 226 Cal.App.4th 503, 530; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  We review the court's finding as to whether "the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" for substantial evidence (§ 366.26, subd. (c)(1)(B)(i)).  (*In re Bailey J.*, at p. 1314.)  "The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.'  (§ 366.26, subd. (c)(1)(B); see [*In re*] *Bailey J.*, at p. 1315.)  This ' "quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its

severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. ([*In re*] *Bailey J.*, at p. 1315.)" (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

C

*Analysis*

In arguing that Dale did not have a parental relationship with W.L., the Agency disregards the juvenile court's finding Dale proved that he was more than a friendly visitor to W.L., who viewed Dale as "daddy." The record leaves no doubt that Dale deeply loves his son. He raised W.L. as a single parent from the time W.L. was less than two weeks old. Dale set limits for W.L., which W.L. respected, and raised a well-behaved, healthy, happy child. Dale said his son was the first thing he thought about when he awoke in the morning and the last thing he thought about when he went to sleep at night. We recognize that W.L. loves his father and wants their relationship to continue. The social worker acknowledged that W.L. would benefit from continued contact with his father.

Dale does not show that the juvenile court abused its discretion in balancing the strength and quality of the natural parent/child relationship in a less permanent placement against the security and the sense of belonging that a new family would confer on W.L. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) We appreciate this was a difficult decision for the juvenile court. Dale has many good qualities as a parent. However, he allowed W.L. to witness domestic violence and arranged for persons who were using drugs to care for his son, such that W.L. tested positive for methamphetamine when he was three years

13

old.  Dale did not adequately address his substance abuse problems or his domestic violence issues during the dependency case, and as a result was not able to offer a safe, stable home to W.L.

Dale contends W.L.'s relationship with him is significantly different from the relationships between the children and their mother in *In re C.F*. (2011) 193 Cal.App.4th 549, in which this court determined that the children did not gain sufficient benefit from their relationships with their mother to outweigh the benefit they would gain from adoption.  (*Id*. at p. 558.)  He argues this case is similar to *In re S.B*. (2008) 164 Cal.App.4th 289, in which this court determined that the beneficial parent/child relationship applied.  Although the bonds between parent and child in this case and in *In re S.B*. appear similar, the circumstances of the parent are distinct.  Unlike the parent in *In re S.B*., Dale did not demonstrate a full measure of commitment to W.L. by completing his case plan and diminishing the risk of harm to his child.  (*Id*. at p. 298.)

Dale criticizes the "winner take all" mentality of case law supporting the termination of parental rights (see D.E. Arrendondo and L.P. Edwards, *Attachment*, *Bonding*, *and Reciprocal Connectedness*, Journal of the Center for Families, Children & the Courts (2000), pp. 109-127), and argues this court should not affirm the order terminating parental rights because W.L. would benefit from continuing his relationships with all of the people who had loved and cared for him, especially Dale, with whom he had a significant, primary emotional attachment.  Although the Legislature has recently recognized such multiple parental relationships in the context of family law cases (see Fam. Code, § 7612, subd. (c), as amended by Stats. 2013, ch. 510, § 4), it has not

14

extended that recognition to parents of those abused or neglected children who need a safe, stable and permanent home. Adoption is the preferred placement for a child who has been abused or neglected and cannot be safely returned to the care of his or her parent. (*In re Michael G.*, *supra*, 203 Cal.App.4th at pp. 588-589.)

Here, we conclude that the juvenile court did not err when it terminated parental rights. At the time of the section 366.26 hearing, W.L. was five years old. He needed a safe, permanent home free from domestic violence and substance abuse. W.L. was happy in his prospective adoptive home. He liked living with his new family, and enjoyed having a sister. The record supports a reasonable inference that living in a home with a mother and a sister will have a positive influence on W.L., and he will not grow up viewing violence against women as normal. Dale's visits with W.L. were interrupted by hospitalization, incarceration and substance abuse treatment for at least five months during the reunification period, and W.L. remained a happy, well-adjusted child. We cannot conclude the juvenile court abused its discretion when it determined W.L.'s need for permanency outweighed the benefit he received from his positive emotional attachment to his father, and therefore the loss of the parent/child relationship did not constitute "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

DISPOSITION

The order terminating parental rights is affirmed.


NARES, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.